**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| ANGELO CASCIA, derivatively on behalf of HERTZ GLOBAL HOLDINGS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>WAYNE GILBERT WEST, SCOTT M. HARALSON, FRANCIS S. BLAKE, LUCY CLARK DOUGHERTY, COLIN FARMER, VINCENT J. INTRIERI, MICHAEL GREGORY O'HARA, ANDREW SHANNAHAN, EVANGELINE VOUGESSIS, and THOMAS WAGNER<br><br>Defendants,<br><br>and<br><br>HERTZ GLOBAL HOLDINGS, INC.,<br><br>Nominal Defendant. | Case No.<br><br>**DEMAND FOR A JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Angelo Cascia ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Hertz Global Holdings, Inc. ("Hertz Global" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Wayne Gilbert West ("West"), Scott M. Haralson ("Haralson"), Francis S. Blake ("Blake"), Lucy Clark Dougherty ("Dougherty"), Colin Farmer ("Farmer"), Vincent J. Intrieri ("Intrieri"), Michael Gregory O'Hara

("O'Hara"), Andrew Shannahan ("Shannahan"), Evangeline Vougessis ("Vougessis"), and Thomas Wagner ("Wagner") (collectively, the "Individual Defendants," and together with Hertz Global, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Hertz Global, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants West and Haralson for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Hertz Global, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from May 7, 2026, through June 23, 2026, both dates inclusive (the "Relevant Period").

2. Hertz Global is a Delaware corporation based in Estero, Florida that provides rental vehicles and services. Specifically, the Company provides worldwide internal combustion engine ("ICE") vehicle and electric vehicle ("EV") rental services from Company-operated, licensee, and franchisee locations. Additionally, Hertz Global sells vehicles and value-added services.

3. The Company conducts its operations through two reportable business segments: the "Americas RAC" and "International RAC." While International RAC offers rental services along with sales of vehicles and value-added services to other international locations, the Americas RAC business segment offers rental services, as well as sales of vehicles and value-added services, in the United States, Canada, Latin America, and the Caribbean.

4. As a car rental business, one of the primary indicators of Hertz Global's performance is the precise measurement of vehicle depreciation. Indeed, the Company often cites "Depreciation Per Unit Per Month" or "DPU" as a vital key metric to management and investors, since one of the Company's largest expenses is the depreciation of revenue-earning vehicles and lease costs.

5. Leading up to and throughout the Relevant Period, the Individual Defendants, in the Company's Form 10-Q filed on May 8, 2026 (the "Q1 2026 Form 10-Q"), touted the success of the "Back-to-Basics" strategy and highlighted the

Company's brand strength, global network and fleet management expertise. Particularly, the Q1 2026 Form 10-Q emphasized the Company's financial stability, liquidity, and business prospects, as well as the stability of its financial position and business prospects.

6. Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by making, and/or causing the Company to make, a series of false and misleading statements and/or omissions that failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company's liquidity was deteriorating more quickly than represented, such that the Company would be unable to sustain its current operations over the next 12 months without distressed and/or dilutive financing; (2) the negative developments in the used-car market were materially affecting the Company's net depreciation unit and Adjusted Corporate EBTIDA; and (3) consequently, the Company would likely have to resort to a distressed and/or dilutive capital raise.. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

7. The truth began to emerge on June 24, 2026, when the Company filed a Form 8-K with the SEC (the "June 2026 Financial Update 8-K") which, contrary to the statements made throughout the Relevant Period, revealed that "unexpected softness in the used car market" resulted in significant losses for the Company in May 2026. In light of these developments, the Company provided updated

estimates of its net DPU and Adjusted Corporate EBITDA at values lower than expected, providing guidance for net DPU of approximately $300 million and Adjusted Corporate EBITDA at a range of $50-$80 million.

8. On the same day, the Company filed another Form 8-K with the SEC announcing a dilutive capital raise (the "Capital Raise 8-K"). Specifically, the Capital Raise 8-K disclosed the Company's intent to offer, through its wholly owned indirect subsidiary, The Hertz Corporation ("Hertz Corp."), $300 million of Exchangeable Senior First-Lien Secured PIK notes due in 2030 and a concurrent share-lending offer at an aggregate public offering price of $100 million.

9. On this news, the price per share of the Company's common stock dropped $2.06, or approximately 40.7%, from a closing price of $5.06 per share on June 23, 2026, to a closing price of $3.00 per share on June 24, 2026.

10. Only a day later, on June 25, 2026, the Company filed a Form 8-K with the SEC, which further announced an upsized dilutive capital raise. This included an offering of "$350 million aggregate principal amount of 6.75% Exchangeable Senior First-Lien Secured PIK Notes due 2030," and a concurrent share-lending offer for approximately 37 million shares of its common stock priced at of $2.70 per share.

11. On this news, the price per share of the Company's common stock dropped $0.32, or approximately 10.6%, from a closing price of $3.00 per share on June 24, 2026, to a closing price of $2.68 per share on June 25, 2026.

12. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

13. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Executive Vice President and Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Middle District of Florida (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

14. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of various of the directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on

behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act Exchange Act (15 U.S.C. §78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and Hertz is headquartered in this District.

## PARTIES

### Plaintiff

20. Plaintiff is a current shareholder of Hertz Global. Plaintiff has continuously held shares of Hertz Global common stock at all relevant times.

### Nominal Defendant Hertz Global

21. Nominal Defendant Hertz Global is a Delaware corporation with its principal executive offices located at 8501 Williams Road, Estero, Florida 33928. Hertz Global's shares trade on the NASDAQ under the ticker symbol "HTZ."

### Defendant West

22. Defendant West has served as the Company's CEO and as a Company director since April 2024.

23. The Company's proxy statement filed on Schedule 14A with the SEC on April 16, 2026 (the "2026 Proxy Statement") states the following about Defendant West:

> We believe that Mr. West is qualified to serve on our Board because of his extensive leadership, management, and operations experience gained from his executive leadership roles in the transportation industry and because of the governance experience gained by serving on other public company boards.

### Defendant Haralson

24. Defendant Haralson has served as the Company's Executive Vice President and CFO since June 2024.

25. The 2026 Proxy Statement states the following about Defendant Haralson:

> Scott M. Haralson, age 53, has served as Executive Vice President and Chief Financial Officer ("CFO") of the Company since June 2024. Prior to joining the Company, from February 2023 to June 2024, he was Executive Vice President and CFO of Spirit Airlines, Inc. ("Spirit"), an airline company. He served as Senior Vice President and CFO of Spirit from October 2018 to January 2023; as Vice President, Financial Planning and Analysis and Corporate Real Estate from August 2017 to October 2018; and as Vice President, Financial Planning and Analysis from August 2012 to July 2017. Prior to his tenure at Spirit, Mr. Haralson held key financial leadership roles at Dish Network, a television and service provider; Frontier Airlines, an airline company; Guardian Gaming, a tabletop gaming company; Swift Aviation, Inc., an aircraft maintenance and repair company; and U.S. Airways, Inc. (previously, America West Airlines), an airline company.

**<u>Defendant Blake</u>**

26. Defendant Blake has served as a Company director since August 2024. Defendant Blake also serves as a member of the Compensation Committee.

27. The 2026 Proxy Statement stated the following about Defendant Blake:

> We believe Mr. Blake is qualified to serve on our Board because of the extensive financial, operational, and leadership experience he gained by serving as the Chair and CEO of a global retailer and because of his expertise in both the travel industry and the transportation sector as the former chair of a global airline. Mr. Blake also brings deep corporate governance experience acquired by serving on other public company boards, as well as an extensive understanding of regulatory frameworks and policymaking, given his high-level public sector experience.

**<u>Defendant Dougherty</u>**

28. Defendant Dougherty has served as a Company director since August 2024. She also serves as a member of the Compensation Committee.

29. The 2026 Proxy Statement stated the following about Defendant Dougherty:

> We believe that Ms. Clark Dougherty is qualified to serve on our Board because of her extensive experience in the mobility sector and because of her expertise in public company legal, compliance, and corporate governance matters acquired through her service as a senior executive in both the public and the private sectors.

**Defendant Farmer**

30. Defendant Farmer has served as Company director since June 2021 and as Chair of the Board since April 2024. He previously served as the Board's Lead Director from August 2022 to April 2023. He also serves as Chair of the Compensation Committee and as a member of Governance Committee.

31. The 2026 Proxy Statement states the following about Defendant Farmer:

> We believe that Mr. Farmer is qualified to serve on our Board because of his significant knowledge of the travel industry, his expertise in capital markets and financial matters, and because of the governance experience he has gained by serving on other company boards.

**Defendant Intrieri**

32. Defendant Intrieri has served as a Company director since June 2016. He also serves as Chair of the Audit Committee.

33. The Company's 2026 Proxy Statement stated the following about Defendant Intrieri:

> We believe Mr. Intrieri is exceptionally qualified to serve on our Board because of his expertise in financial and accounting matters, as well as strategic insight into global operations. As a former Certified Public

> Accountant and accounting partner, and as the current CEO of a private investment fund, Mr. Intrieri has a robust understanding of finance and capital markets. And, with current and prior service on more than 10 public company boards, he brings a wealth of knowledge and perspective that is invaluable to our organization.

**Defendant O'Hara**

34. Defendant O'Hara has served as a Company director since January 2024. He also previously served as a Chair of the Board from June 2021 to January 2023.

35. The 2026 Proxy Statement stated the following about Defendant O'Hara:

> We believe Mr. O'Hara is qualified to serve on our Board because of his profound knowledge of, and experience in, the travel industry, his extensive background in investment analysis and management, and the governance experience he has gained by serving on other public company boards.

**Defendant Shannahan**

36. Defendant Shannahan has served as a Company director since June 2021. He also serves as Chair of the Governance Committee and as a member of the Compensation Committee.

37. The 2026 Proxy Statement stated the following about Defendant Shannahan:

> We believe that Mr. Shannahan is qualified to serve on our Board because of his expertise in complex investment opportunities, finance, and capital markets, and the governance experience he has gained by serving on other company boards.

**Defendant Vougessis**

38. Defendant Vougessis has served as a Company director since September 2021. She also serves as a member of the Audit Committee and as a member of the Governance Committee.

39. The Company's 2026 Proxy Statement stated the following about Defendant Vougessis:

> We believe that Ms. Vougessis is qualified to serve on our Board because of her significant capital markets and investment management expertise, including her experience in financial analysis and strategy.

**Defendant Wagner**

40. Defendant Wagner has served as a Company director and as Vice Chair of the Board since June 2021.

41. The Company's 2026 Proxy Statement stated the following about Defendant Wagner:

> We believe Mr. Wagner is qualified to serve on our Board because of his deep strategic expertise in capital markets, investment management, and the transportation sector, as well as his significant knowledge of business restructurings.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

42. By reason of their positions as officers and/or directors of Hertz Global, and because of their ability to control the business and corporate affairs of Hertz Global, the Individual Defendants owed Hertz Global and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Hertz Global in a fair, just, honest, and equitable manner. The Individual Defendants were and are

required to act in furtherance of the best interests of Hertz Global and its shareholders so as to benefit all shareholders equally.

43. Each director and officer of the Company owes to Hertz Global and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

44. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Hertz Global, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

45. To discharge their duties, the officers and directors of Hertz Global were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

46. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Hertz Global, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

47. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

48. To discharge their duties, the officers and directors of Hertz Global were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Hertz Global were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Florida, Delaware, and the United States, and pursuant to Hertz Global's own Code of Conduct (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Hertz Global conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Hertz Global and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Hertz Global's operations would comply with all applicable laws and Hertz Global's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

49. Each of the Individual Defendants further owed to Hertz Global and the shareholders the duty of loyalty requiring that each favor Hertz Global's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

50. At all times relevant hereto, the Individual Defendants were the agents of each other and of Hertz Global and were at all times acting within the course and scope of such agency.

51. Because of their advisory, executive, managerial, and directorial positions with Hertz Global, each of the Individual Defendants had access to adverse, non-public information about the Company.

52. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Hertz Global.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

53. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

54. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

55. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Hertz Global was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

56. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

57. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of Hertz Global, and was at all times acting within the course and scope of such agency.

## HERTZ GLOBAL'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### *Hertz Global's Code of Conduct*

58. In the introduction section of the Company's Code of Conduct titled "Welcome to the Code," the Code of Conduct highlights that "[a]t Hertz, doing the right thing drives everything we do." The Code of Conduct continues by stating that it is "a practical, easy-to-use resource to understand our key integrity rules. It's also our guide for making decisions that are rooted in integrity."

59. Under the section titled "Embracing our responsibilities," the Code of Conduct emphasizes its applicability to all employees, officers, and directors. It specifically states:

> Everyone at Hertz plays a part in upholding our ethical principles and fostering a culture of integrity. The Code is here to guide our decisions, and it applies to all of us, no matter where we work or what job we do.
>
> **Who the Code applies to:**
> Our Code applies to every Hertz employee, officer, and board director, as well as to our subsidiaries and affiliates around the world. It also sets expectations for the third parties we work with, including contractors, consultants, suppliers, licensees, and franchisees. We expect everyone who acts on behalf of Hertz to live up to the same high standards.

60. In the same section, under the heading "Waivers of the Code," the Code of Conduct states that:

> Waivers for directors or executive officers are made only by the board of directors and must be disclosed to shareholders as required by law.

61. Under the section titled "Maintaining accurate records and accounts," the Code of Conduct states:

> **Keep it clear. Keep it honest.**
>
> We build trust by keeping clean records — everything from rental contracts and expense reports to financial statements. Our records must be truthful and complete.
>
> ***
>
> **Your roadmap to clean records**
>
> • **Create** records that are accurate, complete, and timely.
>
> • **Follow** all company policies and procedures when reporting or submitting information.
>
> • **Retain** records based on the company's Records Retention Policy.
>
> • **Never falsify** records, including backdating documents or hiding mistakes.
>
> • **Respect** legal holds — if directed by Legal, you are required to preserve all relevant communication records (emails, text messages,

instant messages, etc.) and/or any documents on any device or platform.

• **Report** any suspected internal or external fraud, record tampering, or accounting irregularities.

• **Ask** Legal for help if you're unsure how long to keep a record or what needs to be included.

62. Under the section titled "Protecting our financial integrity," the Code of Conduct provides the following:

**Act honestly. Guard our funds.**

We protect Hertz's financial integrity by preventing fraud, stopping illegal activity, and staying alert to warning signs. If something doesn't feel right, speak up.

**Why it matters**

Fraud, money laundering, terrorism financing, and tax evasion are illegal and go against everything we stand for. Even small financial missteps can lead to major legal and reputational harm.

**Your roadmap to financial integrity**

• **Submit** accurate and honest financial records, including invoices, receipts, and reports.

• **Make sure** payments are fair and reasonable for the work or services provided.

• **Watch for** suspicious transactions or requests involving third parties, such as customers or vendors.

• **Verify the identity and integrity of our customers** (know-your-customer principle).

• **Report** any signs of fraud, bribery, or misuse of company funds or other suspected financial crimes.

• **Do not** assist with or ignore attempts to conceal sources of funds (money laundering).

• **Comply** with applicable anti-financial crimes laws that prohibit fraud, tax evasion, or money laundering.

• **Speak up** if you're pressured to bend the rules or approve something that feels off.

***Hertz Global's Corporate Governance Guidelines***

63. The Company also maintains Corporate Governance Guidelines (the "Governance Guidelines"). Under the section titled "Overall Purpose and Responsibilities of the Board" the Governance Guidelines state the following, in relevant part:

> The overall purpose of the Board is to oversee the Company's efforts to create long-term value for its stockholders, as well as other stakeholders. As part of this purpose, the Board adheres to what it believes to be sound governance principles, as set forth in these Guidelines. In its oversight role, the Board maintains a sense of responsibility to the Company's stockholders, customers, employees, suppliers and the communities in which it operates. The Board acts as the ultimate decision-making body of the Company and advises and oversees management, who are responsible for the day-to-day operations and management of the Company.
>
> In order to create long-term value for stockholders and other stakeholders, the Board's core responsibilities include:
>
> - identifying, reviewing and, where appropriate, approving the financial and business strategies and major corporate actions of the Company and monitoring their implementation and results;
>
> - regularly monitoring the effectiveness of management policies and decisions, including the execution of the Company's strategies;
>
> - identifying, selecting, evaluating and compensating the Chief Executive Officer (the "CEO") and reviewing management succession planning;

- providing oversight as to major risks facing the Company and strategies for their management and mitigation;
- overseeing corporate culture and management's efforts to align culture with the Company's purpose and values;
- overseeing efforts to ensure that the Company's business is conducted with the highest standards of ethical conduct and in compliance with applicable laws and regulations;
- overseeing the Company's financial statements and financial reporting process and internal controls; and
- shaping effective corporate governance, including nominating the Company's director candidates and appointing committee members and overseeing the Company's environmental, social and governance practices, policies and activities.

64. The Governance Guidelines outline the obligations of the directors under the heading "Duties of Directors." A sub-section under this heading includes "Director Responsibilities", in which the Governance Guidelines state the following, in relevant part:

> As part of their duty to exercise their business judgment to act in a manner they reasonably believe to be in the best interest of the Company and its stockholders, directors are expected to be active and engaged in discharging this duty by:
>
> - devoting sufficient time and effort to learn, and keep themselves informed about, the business and operations of the Company and the industries in which it operates;
> - making every effort to attend meetings of the Board and the committees on which they serve and to spend the time needed to prepare for these meetings, including reviewing all materials that are provided in advance of the meetings;
> - ensuring other existing and future commitments do not materially interfere with their service as a director; and

- meeting as frequently as necessary to discharge their responsibilities

65. Under the heading "Standards of Business Conduct," the Governance Guidelines state the following:

> Directors will comply with the Company's Standards of Business Conduct (the "Standards of Business Conduct"), which affirm the Company's high standards of business conduct and ethics. The Standards of Business Conduct are part of the Company's continuing effort to comply with all applicable laws, provide an effective program to prevent and detect violations of law, and conduct its business with fairness, honesty and integrity. In the unlikely event of a request for a waiver from compliance, any such request of waiver will be subject to approval by the Board (any director requesting a waiver will not be entitled to vote on such request) and such waiver will be promptly disclosed to stockholders as required by law.

66. The Governance Guidelines outline the function and operations of the Company's committees under the heading "Board Committees." A sub-section under this heading includes "Committee Structure and Charters", in which the Governance Guidelines state the following:

> The Board currently has three standing committees: Audit Committee, Compensation Committee, and Governance Committee. The Board may establish additional committees as necessary or appropriate. Committee members and chairpersons will be appointed by the Board upon the recommendation of its Governance Committee. Each committee will have its own charter setting forth the purpose, membership requirements, responsibilities and procedures of the committee, which shall include an annual self-evaluation.

67. In a section titled "Evaluation and Succession," under the sub-heading "Annual Board Performance Evaluation," the Governance Guidelines speak on Company accountability, stating,

> It is expected that the Board will conduct an annual self-evaluation to determine whether it and its committees are functioning effectively. It is expected that this process will also include annual self-assessments by each Board committee, relying on a review process similar to that used by the Board, with performance criteria for each committee established on the basis of its charter.

68. In violation of the Code of Conduct and the Governance Guidelines, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

**AUDIT COMMITTEE CHARTER**

69. The Hertz Global's Audit Committee Charter (the "Audit Committee Charter") defines the oversight responsibilities of the Company's Audit Committee.

70. Per the Audit Committee Charter, under the section "Purpose and Authority," the purpose of the Audit Committee is generally to "assist the Board in fulfilling certain of the Board's oversight responsibilities[.]"

71. Specifically, "the primary purpose of the Committee is to assist the Board in overseeing" the following:

- the accounting, financial, and external reporting policies and practices of the Company and the audit of the Company's financial statements;
- the integrity of the Company's financial statements;
- the effectiveness of the Company's internal controls, including operational policies and practices;
- the independence, qualifications and performance of the Company's independent auditor;
- the authority, scope, access and performance of the Company's internal audit function;
- the Company's compliance with legal and regulatory requirements;
- treasury and finance matters; and
- enterprise risk management process, including cybersecurity and other technology risks.

72. Under the same section, the Audit Committee Charter further details the authority the Audit Committee has in discharging its duties, stating:

> In discharging its duties under this Charter, the Committee shall have the authority, in its sole discretion, to select, retain, terminate and obtain the advice of any independent legal, accounting, or other advisors as it deems necessary or appropriate to fulfill its duties and responsibilities. The Committee shall approve the terms of any engagement, including compensation, and oversee the work, of any such independent legal, accounting, or other advisors. The Company shall provide appropriate funding, as determined by the Committee, for payment of (i) compensation to the independent accountants for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company and to any advisors employed by the Committee; and (ii) ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties. Any accounting, legal or other consultant retained by the Committee may, but need not, be, in the case of an outside accountant, the same accounting firm employed by the

Company for the purpose of rendering or issuing an audit report on the Company's annual financial statements or, in the case of an outside legal or other advisors, otherwise engaged by the Company for any other purpose.

73. The Audit Committee Charter lists, under the heading "Responsibilities" the following, in relevant part:

1. *Oversight of Financial Reporting, Disclosure and Internal Controls*

a. Review any significant additions or changes to the Company's existing policies or practices as they apply to accounting, financial reporting, external reporting, and asset-safeguarding.

b. Discuss generally the Company's earnings reports, as well as any written financial information and earnings guidance provided to analysts and ratings agencies. The Committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance.

c. Review and discuss with management and the independent auditor the quarterly, unaudited financial statements, including disclosures made in management's discussion and analysis of financial condition and results of operations, major underlying issues and the results of the independent auditor's review prior to filing each quarterly report on Form 10-Q.

d. Review and discuss with management and the independent auditor the annual audited financial statements, including disclosures made in management's discussion and analysis of financial condition and results of operations, and major underlying issues prior to filing each annual report on Form 10-K.

e. Review and discuss with the Chief Executive Officer (the "CEO") and the Chief Financial Officer (the "CFO") the procedures undertaken in connection with the CEO and CFO certifications in periodic reports, including their evaluation of the Company's disclosure controls and procedures and internal controls.

f. Prepare the report required by the rules of the SEC to be included in the Company's annual Proxy Statement.

*    *    *

h. Review and discuss quarterly reports from the independent auditor on all critical accounting policies and practices to be used; all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

i. Review and discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies.

* * *

k. Review and discuss with management and the independent auditor management's internal control report prepared in accordance with rules promulgated by the SEC pursuant to Section 404 of the Sarbanes-Oxley Act and the independent auditor's attestation report prior to the filing of the Company's annual report on Form 10-K, and consider whether any changes are appropriate in light of these reports.

* * *

m. Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control

*2. Oversight of Independent Auditor*

d. Review the conduct and results of the audit of the consolidated financial statements and solicit concerns from the independent auditor, including any audit problems, difficulties encountered in the course of audit work, including any restrictions on the scope of activities or access to requested information, disagreements with management and management's response and communications between the audit team and the audit firm's national office with respect to difficult auditing or accounting issues presented by the engagement.

* * *

g. Obtain and review a report from the independent auditor at least annually detailing: (i) the independent auditor's internal quality-control procedures; (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the independent auditor, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and (iii) all relationships between the independent auditor and the Company.

3. *Oversight of Internal Audit*

c. Review, in consultation with the CAE, the annual internal audit scope and risk-based plan, performance related to the plan and any changes required during the year.

d. At least quarterly, review internal audit results, including any difficulties encountered in the course of internal audit activities, and management's responses thereto.

4. *Oversight of Compliance, Legal and Regulatory Matters*

a. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or audit matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters. This includes overseeing management's arrangements for the prevention and deterrence of fraud.

b. Conduct any investigation that the Committee deems appropriate, with full access to all of the Company's records, facilities, personnel and outside advisors. This includes ensuring that appropriate action is taken against known perpetrators of fraud or related misconduct.

5. *Oversight of Treasury and Finance Matters*

a. Review, as appropriate, the Company's and its subsidiaries' capital markets and financing plans consistent with the prior approvals of the Board, including with respect to the Company's debt, equity or other financing arrangements (including re-financings);

b. Review, as appropriate, the material terms and conditions of the Company's long-term debt financings and its subsidiaries' long-term debt and equity issuances consistent with the prior approvals of the Board, including with respect to bank loans, letter of credit facilities, securitization facilities (including medium term note issuances and variable funding note issuances), collateral security or pledge agreements, promissory notes, commercial paper, and guarantees;

6. *Oversight of Risk*

a. Oversee, review and discuss with management, including the CAE, the Company's enterprise-wide risk management process including management's implementation and maintenance of an appropriate risk governance structure, risk assessment and risk management practices and guidelines.

b. Oversee, review and discuss with management, including the senior technology officer, the quality, effectiveness and matters related to the Company's security of information technology systems, capabilities for disaster recovery, data protection, cyber threat detection and cyber incident response, and management of technology-related compliance risks (including artificial intelligence).

c. Provide oversight on significant risk exposures and control issues, including fraud risks, governance issues, and other matters needed or requested by senior management and the Board. This includes considering the effectiveness of the Company's control framework, including information technology security and control.

d. Provide oversight of the adequacy of the combined assurance being provided.

e. Oversee, review and provide advice on the risk management processes established and maintained by management and the procedures in place to ensure that they are operating as intended.

74. In violation of the Audit Committee Charter, the Individual Defendants (as key officers, and members of the Company's Board) conducted little, if any oversight of the Company's engagement in the Individual Defendants'

scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations Section 14(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## **THE INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

75. Hertz Global is a Delaware corporation based in Estero, Florida which provides ICE and EV rental services from Company-operated, licensee, and franchisee locations. The "Americas RAC" and "International RAC" are the two business segments under which Hertz Global operates, with Americas RAC covering operations in the U.S., Canada, Latin America and the Caribbean and International RAC covering operations in other international locales. Hertz Global is one of the largest international vehicle rental companies and has garnered significant global recognition over time.

76. The Company's two business segments both engage primarily in vehicle rentals, as well as sales of vehicles and value-added services. Additional operations of the Company include corporate operations regarding performance

assessment and resource allocations based upon the financial information provided for Hertz Global's operating segments.

77. Hertz Global's two business segments are primarily operated through the Company's three largest brands – Hertz, Dollar, and Thrifty. Hertz provides several options of brands for customers to choose from, so customers have a full range of rental services at different price points, levels of service, offerings, and products. The Company recognizes Hertz as its top-tier brand, claiming it offers premium customer service and multiple innovative offerings. The Company recognizes Dollar as its smart value brand, marketed as a smart choice for fiscally conscious travelers looking for a dependable and affordable rental vehicle. Additionally, the Company recognizes Thrifty as its deep value brand, considering it the most cost-effective offering for travelers.

78. As the Company boasts a vast fleet of vehicles numbering in the hundreds of thousands, identifying, monitoring, and tracking the deprecation of each vehicle is critical to the Company's business. For this reason, one of Hertz Global's main financial performance indicators is "Depreciation Per Unit Per Month."

79. Following the COVID-19 pandemic, the Company experienced a tumultuous few years which included its filing of a Chapter 11 in 2020 due to the COVID-19's impact on the value of used cars and an unsuccessful investment in electric vehicles due to a drop in the value of electric vehicles and increase in repair costs. However, by 2025 the Company had established and continued to highlight

its "Back-to-Basics" turnaround focused on fleet management, revenue optimization, and cost efficiency.

80. Leading up to and throughout the Relevant Period, the Individual Defendants touted the success of the "Back-to-Basics" strategy and highlighted the Company's brand strength, global network and fleet management expertise. Particularly, the Individual Defendants assured investors of the Company's financial stability, liquidity, and business prospects.

**<u>FALSE AND MISLEADING STATEMENTS</u>**

***May 7, 2026, Form 8-K and Earnings Call***

81. The Relevant Period began on May 7, 2026, when the Company filed with the SEC a Form 8-K ("the Q1 2026 Form 8-K") announcing its financial results for the financial quarter ended on March 31, 2026.

82. Attached as Exhibit 99.1 to the Q1 2026 Form 8-K, was a press release which touted that the first quarter of 2026 reflected the Company's "Strongest Revenue Growth in Three Years." (the "Q1 2026 Press Release").

83. The Q1 2026 Press Release further emphasized that the Company's improved DPU metrics and liquidity, stating the following, in relevant part:

> • Net Depreciation per Unit per Month (Net DPU) was $312 in in [sic] the first quarter, approaching the Company's North Star target and representing a year-over-year improvement of 13%, supported by disciplined fleet rotation. The used car market was in the seasonal trough through February, but has since improved considerably.
>
> • Hertz ended the first quarter with approximately $837 million of liquidity and in April completed additional financing that added approximately $200 million.

84. The Q1 2026 Press Release further addressed the success of the Company's various strategies and the subsequent positive financial and operating results, stating that:

> Through its "Back-to-Basics" strategy, the Company is delivering measurable progress in its core rental operations with a focus on disciplined fleet management, revenue optimization, and rigorous cost control, all guided by its North Star metrics of DPU sub $300, RPU over $1,500, and DOE per Transaction Day in the low $30s.
>
> In the first quarter, the Company delivered sequential improvements through its "Buy Right, Hold Right, Sell Right" strategy with its youngest fleet in nearly a decade. Hertz achieved revenue of $2.0 billion in the first quarter, up 11% year over year and marking its strongest revenue growth in three years through continued, structural improvements to its commercial strategies. The Company drove sequential, year-over-year improvement in RPU and RPD, with RPD delivering a 5.5% increase, which was its most significant year-over-year improvement since the travel recovery and microchip driven spike in 2022. These results, along with the progress towards the Company's North Star DPU target and continued implementation of cost management initiatives, resulted in an Adjusted Corporate EBITDA improvement of nearly 50% year over year.

85. Also on May 7, 2026, the Company held an earnings call with investors and analysts ("Q1 2026 Earnings Call"), hosted by Defendants West and Haralson, to discuss its financial results for the period ended on March 31, 2026.

86. During the Q1 2026 Earnings Call, Defendant Haralson had some prepared remarks where he touted to investors the stability of the Company's liquidity position. Specifically, Defendant Haralson stated the following:

> Turning to liquidity, we ended the quarter with $837 million, which includes cash and cash equivalents and the available capacity under our revolving credit facility. In April, we completed an additional ABS financing that added $200 million of liquidity in the second quarter.

> With other liquidity enhancements planned, ***we expect to end the second quarter with just under $1 billion and look to end the year at north of $1.5 billion***.

(Emphasis added).

***May 8, 2026, Form 10-Q***

87. On May 8, 2026, the Company filed the Q1 2026 Form 10-Q. The Q1 2026 Form 10-Q was signed by Defendant Haralson and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") were signed by Defendants West and Haralson attesting to the accuracy of the Q1 2026 Form 10-Q and that "this report [Q1 2026 Form 10-Q] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

88. The Q1 2026 Form 10-Q reiterated substantially the same information as the Q1 2026 Form 8-K regarding the Company's DPU and liquidity positions. The Q1 2026 Form 10-Q also emphasized the stability of the Company's financial stability and positioning, stating that the Company "***will be sufficient to fund our operating activities and obligations for the next twelve months and for the foreseeable future thereafter***." (Emphasis added).

89. The statements referenced in ¶¶ 81-88 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to

disclose, *inter alia*, that: (1) the Company's liquidity was deteriorating more quickly than represented, such that the Company would be unable to sustain its current operations over the next 12 months without distressed and/or dilutive financing; (2) the negative developments in the used-car market were materially affecting the Company's net depreciation unit and Adjusted Corporate EBTIDA; and (3) consequently, the Company would likely have to resort to a distressed and/or dilutive capital raise.. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***May 28, 2026 Meeting of Stockholders***

90. On May 28, 2026, the Company hosted its Annual Meeting of Stockholders (the "2026 Annual Meeting"). Prior to this, on April 16, 2026, Defendants West, Blake, Dougherty, Farmer, Intrieri, O'Hara, Shannahan, Vougessis, and Wagner solicited the 2026 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

91. The 2026 Proxy Statement called for the Company's shareholders to vote *inter alia,* to: (1) elect Defendants Dougherty and Vougessis to serve as Class II directors until 2029; (2) ratify the selection of Ernst & Young LLP ("EY") as the Company's independent registered accounting firm for the fiscal year ending December 31, 2026; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

92. Regarding "Corporate Governance," the 2026 Proxy Statement states:

Our Board is committed to strong corporate governance practices and promoting the long-term interests of our stockholders by adopting structures, policies, and practices that promote responsible oversight of management. To this end, our ownership structure currently qualifies us as a “controlled company” under the applicable rules of The Nasdaq Stock Market (the “Nasdaq”), which we refer to as the Nasdaq listing rules (the “Nasdaq listing rules”). Controlled companies are not required to comply with various corporate governance requirements. These requirements include having a majority of independent directors and having independent Compensation and Governance committees. Although we qualify as a controlled company, our Board regularly evaluates its corporate governance practices and has elected not to make use of any of the exceptions to controlled companies under the Nasdaq listing rules. Notably, our corporate governance structure includes the features noted below.

- **Separation of Board Chair and CEO Roles**
- **Fully Independent Standing Committees**
- **Committee Charters and Annual Calendars**
- **Regularly Scheduled Executive Sessions of the Board**
- **Board and Committee Evaluation Processes**
- **Board Retirement Age**
- **Orientation and Continuing Education for Directors**
- **Stockholder Rights to Call Special Meetings**

93. Regarding “Risk Oversight,” the 2026 Proxy Statements states:

Our senior leadership team is responsible for identifying, assessing, and managing our exposure to risk. The Board and its committees play an active role in overseeing management’s activities and evaluating whether management’s operating and financial plans are balanced from a risk/reward perspective. The Board and its committees perform this oversight through a variety of mechanisms. For example, at the full Board level, the Board receives a strategic plan presentation from management each year, and this presentation

> generally covers management's expectations for the upcoming three-year period. The Board also reviews management's proposed annual operating plan each year. By engaging with management on both strategic and annual planning, the Board can evaluate risk across multiple time-horizons, including long-term (e.g., risks and opportunities related to the future of mobility generally), medium-term (e.g., risks and opportunities across the rolling three-year periods generally aligned with our strategic planning cycle), and shorter periods (e.g., risks and opportunities more relevant to our current-year plans).

94. In the same section, the 2026 Proxy Statement details the Audit Committee's specific oversight responsibilities, stating that:

> The Audit Committee reviews reports from management and discusses policies with respect to significant enterprise risks facing the Company, including, but not limited to financial risks (such as treasury risks, cybersecurity risks, and information technology risks) and how such risks are being identified, assessed, and managed by the Company and management. In addition, the Audit Committee is responsible for overseeing risks related to the Company's financial condition (including matters such as liquidity, debt levels, credit ratings, and interest rate risk exposure), capital structure (including sources and uses of capital), and long-term financing strategy. The Audit Committee oversees our management of financial risks by, among other things, reviewing our significant accounting policies, maintaining oversight of our internal audit function, holding regular executive sessions with our CFO and CAE, and engaging in regular discussion with representatives of our independent auditors. The Audit Committee oversees our management of compliance risk by receiving regular legal, compliance, and regulatory updates from the Company's Chief Compliance Officer (the "CCO") and legal counsel, including, from time to time, outside counsel. Our management provides an enterprise risk management report to the Audit Committee on a regular basis, and this report catalogs the top risks that management believes to be facing the Company. The Chair of the Audit Committee reports to the Board on the Audit Committee's activities.

95. Under the direction and watch of Defendants West, Blake, Dougherty, Farmer, Intrieri, O'Hara, Shannahan, Vougessis, and Wagner, the 2026 Proxy

Statement failed to disclose *inter alia,* that: (1) the Company's liquidity was deteriorating more quickly than represented, such that the Company would be unable to sustain its current operations over the next 12 months without distressed and/or dilutive financing; (2) the negative developments in the used-car market were materially affecting the Company's net depreciation unit and Adjusted Corporate EBTIDA; and (3) consequently, the Company would likely have to resort to a distressed and/or dilutive capital raise.. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

96. The 2026 Proxy also failed to disclose, *inter alia*, that, contrary to the 2026 Proxy Statement's descriptions of the Board's and its committees' oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

97. As a result of Defendants West, Blake, Dougherty, Farmer, Intrieri, O'Hara, Shannahan, Vougessis, and Wagner causing the 2026 Proxy Statement to be false and misleading, at the Annual Meeting of Shareholders on May 28, 2026, the Company's shareholders to voted *inter alia*, to: (1)re-elect Defendants Dougherty and Vougessis, to serve as Class II directors until 2029, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the selection of EY as the Company's independent registered accounting firm

for the fiscal year ending December 31, 2026; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers.

**The Truth Emerges**

***June 24, 2026, Form 8-Ks***

98. The truth began to emerge on June 24, 2026, when the Company filed the June 2026 Financial Update 8-K, which disclosed previous losses in May 2026 would drive the Company's financial performance for the financial quarter ending on June 30, 2026.

99. Contrary to the Individual Defendants' previous assurances of the Company's financial stability and transitory market losses, the June 2026 Financial Update 8-K disclosed that, as the result of "[c]urrent unexpected softness in the used car market caused," the Company had "realize[d] losses on the sale of vehicles in May 2026," resulting in a decrease to the Company's Adjusted Corporate EBITDA down to the range of $50-$80 million.

100. The same day, the Company filed the Capital Raise 8-K, announcing a large-scale dilutive capital raise comprised of a private note offering and a share-lending offering.

101. The Capital Raise 8-K, disclosed that the Company, through its wholly owned subsidiary, Hertz Corp., intended to offer "$300 million in aggregate principal amount of Exchangeable Senior First-Lien Secured PIK Notes (the "Notes") due 2030."

102. The Capital Raise 8-K further disclosed that the Company's intent to offer shares of its common stock pursuant to a share lending agreement—through which neither the Company nor Hertz Corp. will receive any proceeds.

103. On this news, the price per share of the Company's common stock dropped $2.06, or approximately 40.7%, from a closing price of $5.06 per share on June 23, 2026, to a closing price of $3.00 per share on June 24, 2026.

***June 25, 2026 Form 8-K***

104. The truth fully emerged on June 25, 2026, when the Company filed with the SEC a Form 8-K ("Upsized Offer 2026 8-K") announcing the pricing of its offering of common stock and the upsized offering of Notes.

105. The Upsized Offer 2026 8-K revealed that the Company, through Hertz Corp., increased the aggregate principal of its note offering from its previously announced offering amount by $50 million. In particular, the Upsized Offer 2026 8-K disclosed that the Company had priced the offering at $350 million (up to $400 million), with an aggregate principal amount of 6.75% Exchangeable Senior First-Lien at an exchange price of $3.58 per share, while any borrowed common stock sold to the public was priced at $2.70 per share.

106. On this news, the price per share Company's common stock dropped $0.32, or approximately 10.6%, from a closing price of $3.00 per share on June 24, 2026, to a closing price of $2.68 per share on June 25, 2026.

**DAMAGES TO HERTZ GLOBAL**

107. As a direct and proximate result of the Individual Defendants' conduct, Hertz Global has lost and will continue to lose and expend many millions of dollars.

108. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

109. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

110. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

111. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

112. As a direct and proximate result of the Individual Defendants' conduct, Hertz Global has also suffered and will continue to suffer a loss of

reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

**DERIVATIVE ALLEGATIONS**

113. Plaintiff brings this action derivatively and for the benefit of Hertz Global to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as officers and directors of Hertz Global, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

114. Hertz Global is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

115. Plaintiff is and has been at all relevant times, a shareholder of Hertz Global. Plaintiff will adequately and fairly represent the interests of Hertz Global in enforcing and prosecuting its rights, and to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

116. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

117. A pre-suit demand on the Board of Hertz Global is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants West, Blake, Dougherty, Farmer, Intrieri, O'Hara, Shannahan, Wagner, and Vougessis ("Director Defendants"). Plaintiff

needs only to allege demand futility as to five of nine Director Defendants who are on the Board at the time this action is commenced.

118. Demand is excused as to all the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material facts. This renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

119. In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. Specifically, the Director Defendants knowingly or recklessly made material misrepresentations and/or omissions for the purpose and effect of concealing Hertz Global's financial well-being and prospects from the investing public and supporting the artificially inflated price of Hertz Global's securities. Moreover, the Director Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, demand would be futile, and thus excused, as to all the Director Defendants, since they all breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested.

120. Additional reasons that demand on Defendant West is futile follow. Defendant West has served as the Company's CEO and as a director since April

2024. The Company provides Defendant West with his principal employment for which he receives lucrative compensation. Thus, as the Company admits he is a non-independent director. As the Company's highest officer and as a trusted director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, Defendant West also failed to correct the false and misleading statements alleged herein. Defendant West solicited the 2026 Proxy Statement, which contained false and misleading statements and contributed to, *inter alia*, the reelection of Defendants Dougherty and Vougessis to the Board, which allowed them to continue to breach their fiduciary duties to the Company. Furthermore, Defendant West is a defendant in the Securities Class Action which has brought reputational and financial harm to the Company. For these reasons, Defendant West breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

121. Additional reasons that demand on Defendant Blake is futile follow. Defendant Blake has served as a Company director since August 2024 and serves as a member of the Compensation Committee. Defendant Blake receives sizable compensation for his role as a Company director. As a trusted director, he conducted little, if any, oversight of the scheme to cause the Company to make false

and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, Defendant Blake failed to correct the false and misleading statements alleged herein. Defendant Blake solicited the 2026 Proxy Statement, which contained false and misleading statements and contributed to, *inter alia*, the reelection of Defendants Dougherty and Vougessis to the Board, which allowed them to continue to breach their fiduciary duties to the Company. For these reasons, Defendant Blake breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

122. Additional reasons that demand on Defendant Dougherty is futile follow. Defendant Dougherty has served as a Company director since August 2024 and serves as a member of the Compensation Committee. Defendant Dougherty receives sizable compensation for her role as a Company director. As a trusted director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, Defendant Dougherty failed to correct the false and misleading statements alleged herein. Defendant Dougherty solicited the 2026 Proxy Statement, which contained false and misleading statements and

contributed to, *inter alia*, the reelection of herself and Defendant Vougessis to the Board, which allowed them to continue to breach their fiduciary duties to the Company. For these reasons, Defendant Dougherty breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

123. Additional reasons that demand on Defendant Farmer is futile follow. Defendant Farmer has served as a Company director since June 2021 and as Chair of the Board since April 2024. He also previously served as the Board's Lead Director from August 2022 to April 2024. He also serves as Chair of the Compensation Committee and as a member of the Governance Committee. Defendant Farmer receives sizable compensation for his role as a Company director. As a trusted Company director, Defendant Farmer conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Farmer solicited the 2026 Proxy Statement, which contained false and misleading statements and contributed to, *inter alia*, the reelection of Defendants Dougherty and Vougessis to the Board, which allowed them to continue to breach their fiduciary duties to the Company. For these reasons, Defendant Farmer faces a

substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

124. Additional reasons that demand on Defendant Intrieri is futile follow. Defendant Intrieri has served as a Company director since June 2016. He also serves as the Chair of the Audit Committee. Defendant Intrieri receives sizable compensation for his role as a Company director. As a trusted Company director, Defendant Intrieri conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Intrieri solicited the 2026 Proxy Statement, which contained false and misleading statements and contributed to, *inter alia*, the reelection of Defendants Dougherty and Vougessis to the Board, which allowed them to continue to breach their fiduciary duties to the Company. For these reasons, Defendant Intrieri faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

125. Additional reasons that demand on Defendant O'Hara is futile follow. Defendant O'Hara has served as a Company director since January 2024. He also previously served as Company director from June 2021 to January 2023. Defendant O'Hara receives sizeable compensation for his roles as a Company

director. As a trusted Company director, Defendant O'Hara conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant O'Hara solicited the 2026 Proxy Statement, which contained false and misleading statements and contributed to, *inter alia*, the reelection of Defendants Dougherty and Vougessis to the Board, which allowed them to continue to breach their fiduciary duties to the Company. For these reasons, Defendant O'Hara faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

126. Additional reasons that demand on Defendant Shannahan is futile follow. Defendant Shannahan has served as a Company director since June 2021. He also serves as Chair of the Governance Committee and as a member of the Compensation Committee. Defendant Shannahan receives sizeable compensation for his role as a Company director. As a trusted Company director, Defendant Shannahan conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements

alleged herein. Defendant Shannahan solicited the 2026 Proxy Statement, which contained false and misleading statements and contributed to, *inter alia*, the reelection of Defendants Dougherty and Vougessis to the Board, which allowed them to continue to breach their fiduciary duties to the Company. For these reasons, Defendant Shannahan faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

127. Additional reasons that demand on Defendant Wagner is futile follow. Defendant Wagner has served as a Company director and Vice Chair of the Board since June 2021. Additionally, Defendant Wagner is owner of GT Racing, LTD., which has a sponsorship agreement with the Company. Thus, as the Company admits he is a non-independent director. Defendant Wagner receives sizeable compensation for his role as a Company director. As a trusted Company director, Defendant Wagner conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Defendant Wagner solicited the 2026 Proxy Statement, which contained false and misleading statements and contributed to, *inter alia*, the reelection of Defendants Dougherty and Vougessis to the Board, which allowed them to continue to breach their fiduciary duties to

the Company. For these reasons, Defendant Wagner faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

128. Additional reasons that demand on Defendant Vougessis is futile follow. Defendant Vougessis has served as a Company director since September 2021. She also serves as a member of the Audit Committee and as a member of the Governance Committee. Defendant Vougessis receives sizeable compensation for her role as a Company director. As a trusted Company director, Defendant Vougessis conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. Defendant Vougessis solicited the 2026 Proxy Statement, which contained false and misleading statements and contributed to the reelection of herself and Defendant Dougherty to the Board, which allowed them to continue to breach their fiduciary duties to the Company. For these reasons, Defendant Vougessis faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

129. Additional reasons that demand on the Board is futile follow.

130. Director Defendants Intrieri (as Chair) and Vougessis served as members of the Audit Committee at all relevant times. As such, they were

responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, Defendants Intrieri and Vougessis breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

131. In violation of the Code of Conduct, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. In addition, the Director Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director

Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

132. Hertz Global has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Hertz Global any part of the damages Hertz Global suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

133. The acts complained of herein constitute violations of fiduciary duties owed by Hertz Global's officers and directors, and these acts are incapable of ratification.

134. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's Audit Committee Charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

135. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Hertz Global. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Hertz Global, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

136. If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Hertz Global to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

137. Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least five of the Director Defendants cannot

consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**
**Against Defendants West, Blake, Dougherty, Farmer, Intrieri, O'Hara, Shannahan, Wagner, and Vougessis for Violations of Section 14(a) of the Exchange Act**

138. Plaintiff incorporates by reference and re-alleges each and every allegation contained within the foregoing paragraphs one (1) through one hundred thirty-seven (137), as though fully set forth herein.

139. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

140. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

141. Under the direction and watch of Defendants West, Blake, Dougherty, Farmer, Intrieri, O'Hara, Shannahan, Wagner, and Vougessis, the 2026 Proxy Statement failed to disclose that contrary to the 2026 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

142. The 2026 Proxy Statement failed to disclose that: (1) the Company's liquidity was deteriorating more quickly than represented, such that the Company would be unable to sustain its current operations over the next 12 months without distressed and/or dilutive financing; (2) the negative developments in the used-car market were materially affecting the Company's net depreciation unit and Adjusted Corporate EBTIDA; and (3) consequently, the Company would likely have to resort to a distressed and/or dilutive capital raise.. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

143. In exercise of reasonable care, Defendants West, Blake, Dougherty, Farmer, Intrieri, O'Hara, Shannahan, Wagner, and Vougessis, should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2026 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2026 Proxy

Statement at the Company's Annual Meeting of shareholders on May 28, 2026, including the re-election of directors.

144. The Company was damaged as a result of Defendants West, Blake, Dougherty, Farmer, Intrieri, O'Hara, Shannahan, Wagner, and Vougessis material misrepresentations and omissions in the 2026 Proxy Statement.

145. Plaintiff on behalf of Hertz Global has no adequate remedy at law.

**<u>SECOND CLAIM</u>**
**Against the Individual Defendants for Breach of Fiduciary Duties**

146. Plaintiff incorporates by reference and re-alleges each and every allegation contained within the foregoing paragraphs one (1) through one hundred thirty-seven (137) as though fully set forth herein.

147. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Hertz Global's business and affairs.

148. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

149. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Hertz Global.

150. In breach of their fiduciary duties owed to Hertz Global, the Individual Defendants willfully or recklessly made and/or caused the Company to make materially false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's liquidity was deteriorating more quickly than represented, such that the Company would be unable to sustain its current operations over the next 12 months without distressed and/or dilutive financing; (2) the negative developments in the used-car market were materially affecting the Company's net depreciation unit and Adjusted Corporate EBTIDA; and (3) consequently, the Company would likely have to resort to a distressed and/or dilutive capital raise.. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

151. The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

152. Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

153. The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the

truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

154. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

155. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Hertz Global has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

156. Plaintiff on behalf of Hertz Global has no adequate remedy at law.

## THIRD CLAIM
## Against the Individual Defendants for Unjust Enrichment

157. Plaintiff incorporates by reference and re-alleges each and every allegation contained within the foregoing paragraphs one (1) through one hundred thirty-seven (137) as though fully set forth herein.

158. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Hertz Global.

159. The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation

from Hertz Global that was tied to the performance or artificially inflated valuation of Hertz Global, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

160. Plaintiff, as a shareholder and representative of Hertz Global, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

161. Plaintiff on behalf of Hertz Global has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

162. Plaintiff incorporates by reference and re-alleges each and every allegation contained within the foregoing paragraphs one (1) through one hundred thirty-seven (137) as though fully set forth herein.

163. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

164. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

165. Plaintiff on behalf of Hertz Global has no adequate remedy at law.

## FIFTH CLAIM
## Against the Individual Defendants for Abuse of Control

166. Plaintiff incorporates by reference and re-alleges each and every allegation contained within the foregoing paragraphs one (1) through one hundred thirty-seven (137) as though fully set forth herein.

167. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Hertz Global, for which they are legally responsible.

168. As a direct and proximate result of the Individual Defendants' abuse of control, Hertz Global has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Hertz Global has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

169. Plaintiff on behalf of Hertz Global has no adequate remedy at law.

## SIXTH CLAIM
## Against the Individual Defendants for Gross Mismanagement

170. Plaintiff incorporates by reference and re-alleges each and every allegation contained within the foregoing paragraphs one (1) through one hundred thirty-seven (137) as though fully set forth herein.

171. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their

responsibilities and fiduciary duties with regard to prudently managing the assets and business of Hertz Global in a manner consistent with the operations of a publicly held corporation.

172. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Hertz Global has sustained and will continue to sustain significant damages.

173. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

174. Plaintiff on behalf of Hertz Global has no adequate remedy at law.

## SEVENTH CLAIM
## Against Defendants West and Haralson for Contribution Under Sections 10(b) and Section 21D of the Exchange Act

175. Plaintiff incorporates by reference and re-alleges each and every allegation contained within the foregoing paragraphs one (1) through one hundred thirty-seven (137) as though fully set forth herein.

176. Hertz Global and Defendants West and Haralson are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants West's and Haralson's willful and/or reckless violations of their obligations as officers and/or directors of Hertz Global.

177. Defendants West and Haralson because of their positions of control and authority as officers and/or directors of Hertz Global, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Hertz Global, including the wrongful acts complained of herein and in the Securities Class Action.

178. Accordingly, Defendants West and Haralson are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

179. As such, Hertz Global is entitled to receive all appropriate contribution or indemnification from Defendants West and Haralson.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Hertz Global, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Hertz Global;

(c) Determining and awarding to Hertz Global the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Hertz Global and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Hertz Global and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Hertz Global to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Hertz Global restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: September 17, 2026

**LAW OFFICE OF JOSE D. SOSA, P.C.**

***/s/ Jose D. Sosa***
Jose D. Sosa
Florida Bar No.: 150878
1141 Via Jardin
Palm Beach Gardens, FL 33418
Tel.: (561) 670-8237
E-Mail: pepe@pepesosalaw.com
sosalaw@yahoo.com

and

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Tel: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*